# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ISAAC BANKS,

     Plaintiff,

     v.

NANCY A. BERRYHILL,[1] Acting
Commissioner of Social Security,

     Defendant.

No. 16 C 8330

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Isaac Banks (Plaintiff) filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D.

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

Ill. 2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1.   Is the claimant presently unemployed?

2.   Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?

3.   Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4.   Is the claimant unable to perform his or her former occupation?

5.   Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standards for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff protectively applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on May 24, 2013, alleging that he became disabled on December 20, 2012, due to a fractured spine. (R. at 20, 77, 84). These claims were denied initially and upon reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 20, 140–41). On December 9, 2015, Plaintiff, represented by counsel, testified at a hearing before Administrative Law Judge (ALJ) Luke Woltering. (*Id.* at 20, 33–75). The ALJ also heard testimony from Jackie Bethel, a vocational expert (VE). (*Id.*).

The ALJ denied Plaintiff's request for benefits on January 22, 2016. (R. at 17–28). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of December 20, 2012. (*Id.* at 22). At step two, the ALJ found Plaintiff's cervical spinal stenosis with cervical radiculopathy and chronic pain syndrome to be severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 24).

The ALJ then assessed Plaintiff's Residual Functional Capacity (RFC)[3] and determined that Plaintiff has the RFC to perform light work with the following additional limitations: "no overhead reaching; occasional reaching in other

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

directions; occasional handling, fingering, and feeling with the left non-dominant upper extremity; no crawling or climbing ladders, ropes or scaffolds; occasional stooping, kneeling and crouching." (R. at 24). The ALJ determined at step four that Plaintiff was capable of performing his past relevant work in general merchandise sales. (*Id.* at 27). Accordingly, the ALJ concluded that Plaintiff was not under a disability, as defined by the Act, from the alleged onset date through the date of the ALJ's decision. (*Id.* at 28).

The Appeals Council denied Plaintiff's request for review on June 24, 2016. (R. at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v.*

*Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although the Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff's injuries reportedly stem from a July 2012 altercation in which he was hit in the back/neck with a crowbar. (R. at 327). In January 2013, Plaintiff began experiencing symptoms of numbness and tingling in the left arm and hand, and

pain in the left shoulder and elbow. (*Id*.) A January 14, 2013 MRI of the cervical spine revealed severe spinal stenosis with spinal cord compression at C6-C7, associated with a prominent disc protrusion that was more marked on the left. (*Id*. at 303). The interpreting radiologist indicated that alteration of the spinal cord signal at this level was consistent with myelomalacia (softening of the spinal cord) and/or edema. (*Id*.). The MRI also revealed evidence of underlying congenital cervical spinal stenosis, as well as a smaller disc protrusion and less marked cord compression at C5-C6. (*Id*.).

Plaintiff was referred to the neurology department at Rush University Medical Center and met with Laura Jawidzik, M.D., on January 29, 2013, for further evaluation. (R. at 339–42). Dr. Jawidzik assessed cervical myelopathy from severe spinal stenosis. (*Id*. at 342). Given the degree of compression, Dr. Jawidzik referred Plaintiff to neurosurgeon Harel Deutsch, M.D., for an urgent surgical evaluation. (*Id*.). Due to the degree of pain and Plaintiff's failure to improve with more conservative measures, Dr. Deutsch recommended surgery. (*Id*. at 309).

On February 22, 2013, Plaintiff underwent at C6-C7 anterior cervical discectomy and fusion performed by Dr. Deutsch. (R. at 343). At a May 2013 follow-up visit, Plaintiff reported tingling and numbness in his left arm and hand, although no abnormalities were noted on physical examination. (*Id*. at 306). Dr. Deutsch assessed cervical spinal stenosis. (*Id*.). On August 7, 2013, Plaintiff returned to Dr. Deutsch with complaints of intermittent neck pain, upper back pain, left arm pain (described as a burning sensation), and continued numbness and tingling in the

fingers on his left hand. (*Id.* at 305). Dr. Deutsch's findings on physical examination remained unchanged from Plaintiff's prior visit. (*Id.*). Dr. Deutsch again assessed cervical spinal stenosis and noted that Plaintiff continued to take Neurontin and Norco for his pain. (*Id.*).

Plaintiff began treating with a new primary care physician, Michael Appiagyei, M.D., on August 30, 2013. (R. at 369–71). The medical records reflect an ongoing treatment relationship where Plaintiff met with Dr. Appiagyei on an almost monthly basis between August 2013 and November 2015. (*Id.* at 369–435). Dr. Appiagyei's diagnoses included: cervical radiculopathy (*id.* at 370, 403, 411); displaced cervical intervertebral disc (*id.* at 376, 385); cervical disc disorder with myelopathy (*id.* at 373); displaced lumbar intervertebral disc (*id.* at 388); lumbago with sciatica on the right side (*id.* at 437); and chronic pain syndrome (*id.* at 371, 375, 377, 379, 388, 393, 399, 401, 409, 414, 418, 420, 422, 427, 430, 434).

The records indicate that Plaintiff benefitted from the use of Norco and Neurontin and that his pain was generally noted to be "controlled"; however, Plaintiff consistently reported pain levels of 7–8/10. (*See, e.g.*, R. at 369, 374, 376, 378, 381, 392, 397, 408, 410, 413, 416, 419, 421, 429, 429, 433, 438). Aggravating factors included lifting, movement, and prolonged sitting. (*Id.* at 369, 372, 374, 404, 408, 429). Plaintiff demonstrated decreased and/or limited range of motion in his back and neck at nearly every visit. (*Id.* at 370, 375, 377, 379, 382, 392, 393, 399, 403, 409, 411, 414, 430, 439). Most physical examinations demonstrated normal musculoskeletal symmetry, tone, and strength; however, diminished strength and

tone were noted in December 2013 and January 2015. (*Id*. at 379, 402). Wasting/atrophy of the left arm and hand was documented in September 2013, January and February 2014, and January 2015. (*Id*. at 373, 385, 388, 402). Plaintiff frequently reported symptoms of numbness, tingling, and pain radiating into his arms. (*Id*. at 369, 384, 387, 389, 392, 402, 410, 416, 433). Tenderness in Plaintiff's cervical and lumbar paraspinal muscles was noted in August and September 2013, May 2014, and April 2015. (*Id*. at 370, 373, 393, 414).

On September 13, 2013, Towfig Arjmand, M.D., a nonexamining DDS consultant, reviewed Plaintiff's records and completed a physical RFC assessment. (R. at 77–82). Dr. Arjman opined that Plaintiff could lift and/or carry up to 50 pounds occasionally and 25 pounds frequently, could stand and/or walk for up to six hours in an eight-hour workday, and could sit for up to six hours in an eight-hour workday. (*Id*. at 80). Dr. Arjmand additionally concluded that objective evidence alone substantiated Plaintiff's statements about the intensity, persistence, and functionally limiting effects of his symptoms. (*Id*.).

Plaintiff attended physical therapy at Ingalls Memorial Hospital from October 2013 through March 2014. (R. at 476–499). Initially, he had reduced strength throughout his upper left extremity, including grip, compared to his right. (*Id*. at 476). He also demonstrated decreased sensation to light touch in his left arm. (*Id*.). Plaintiff regained his strength in his left upper extremity, but continued to demonstrate decreased grip strength and impaired sensation. (*Id*. at 478). He also demonstrated reduced range of motion in his cervical and lumbar spine. (*Id*. at 497–

98). Upon discharge, he continued to demonstrate decreased left hand grip and pinch strength, impaired sensation in his left hand, and still reported numbness in his left hand and a burning sensation from his elbow to his wrist. (*Id*. at 480).

On February 26, 2014, Dr. Appiagyei opined Plaintiff could lift and/or carry ten pounds or less occasionally, and 20 pounds rarely. (R. at 366). Plaintiff could sit only one hour, stand only one hour, and walk only two blocks, at a time. (*Id*. 365). He could stand and/or walk for two hours, and sit for four hours, total, in an eight-hour workday. (*Id*. at 366). However, he required periods of walking around during the day and would need to shift positions, at will, between sitting, standing, or walking. (*Id*.). He would sometimes need to take unscheduled breaks, possibly every hour for 15–30 minutes because of muscle aches and pain. (*Id*.). Dr. Appiagyei opined Plaintiff's symptoms would constantly be severe enough to interfere with his attention and concentration, even to perform simple work tasks. (*Id*. at 365).

On May 5, 2014, Plaintiff met with Piyush Buch, M.D., for a psychiatric consultative examination. (R. at 360–61). By way of history, Plaintiff indicated that he had been seeing a psychiatrist for about eight years due to work stress. (*Id*. at 360). He stated that he had a history of spinal surgery and now had back pain and no feeling in his arms. (*Id*.). Plaintiff stated that because of his condition, he suffered from depression, crying spells, and poor sleep. (*Id*.). Plaintiff reported feeling helpless and hopeless, and increased feelings of agitation and irritability. (*Id*.). He reported trouble sleeping, periods of being "slowed down," loss of energy, loss of motivation, and loss of sex drive. (*Id*.). On mental status examination, Dr.

Buch noted that Plaintiff's attention and concentration were good and his memory was average. (R. at 361). His intelligence, general knowledge, abstract thinking, and social judgment were good. (*Id*.). Plaintiff related well and handled the stress of the interview fairly. (*Id*.). Additionally, Plaintiff was able to understand, remember, and carry out instructions. (*Id*.). Dr. Buch diagnosed major depressive disorder. (*Id*.).

On May 13, 2014, Dr. Arjmand's physical RFC assessment was affirmed at the reconsideration level by nonexamining DDS consultant James Hinchen, M.D. (*Id*. at 97–105). Because depression was alleged at the reconsideration, nonexamining DDS consultant Russell Taylor, Ph.D., also reviewed Plaintiff's records. (*Id*.) Dr. Taylor found Plaintiff's alleged depression to be a non-severe impairment and concluded that Plaintiff suffered no more than mild limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (*Id*. at 102). Dr. Taylor found Plaintiff to be only partially credible, as the cognitive limitations he noted in his activities of daily living were not consistent with objective evidence. (*Id*. at 103).

On December 1, 2015, Jason Smith, D.O., opined that Plaintiff was not able to sustain an eight-hour workday without suffering from intense pain. (R. at 567). Dr. Smith opined that Plaintiff was unable to perform at even 60% of his full work capacity due to ongoing loss of sensation, scar tissue formation, frequent and severe myalgias, inadequate muscle retraining, chronic pain, and reduced sleep. (*Id*. at 568).

Plaintiff testified that he experiences pain in his lower back, both arms, and across his shoulders. (R. at 52). His symptoms began after an altercation in July of 2012, but the symptoms first became severe in December 2012. (*Id*. at 64). Without his medications, his pain is typically at eight and a half or nine out of ten, but with the medications the pain usually goes down to a five or a six. (*Id*. at 53). His medications cause dizziness. (*Id*. at 56). He attempts in-home exercises, such as stretching with a rubber band, little leg lifts, and small calisthenics. (*Id*. at 54). He also tries walking, usually just for fifteen minutes at a time; he typically needs to sit down after walking for 30 minutes. (*Id*. at 55). Plaintiff estimated that he is able to stand for 15 minutes at a time before needing to change positions, and he can sit for about an hour before needing to stand or lie down. (*Id*. at 55–56). He also experiences numbness and burning in his arms and hands, but he can generally feel touch. (*Id*. at 55). He is able to lift five to ten pounds. (*Id*. at 56).

Although Plaintiff lives in a two-story home, he stays on the first floor. (*Id*. at 42). He lives with his two sons, ages six and eighteen. (*Id*. at 42–43). On a normal day, he helps his youngest son get ready for school and drives him to school. (*Id*. at 56). He spends the rest of the day around the house until it is time to pick his son up from school. (*Id*.). He receives assistance from his sons and other family and friends with household chores. (*Id*.). The household chores he can still perform take twice as long to complete because of his pain. (*Id*. at 228). He does no yard work, cooks only simple meals, and has difficulty dressing his bottom half, including

putting on socks and shoes. (*Id*. at 228, 260–62). He has trouble sitting to drive long distances. (*Id*. at 264).

## V. DISCUSSION

Plaintiff argues that the ALJ's decision contains errors of law and is not supported by substantial evidence because (1) the ALJ's analysis of Plaintiff's treating physicians' opinions was legally insufficient and not supported by substantial evidence; (2) the ALJ improperly assessed Plaintiff's credibility and subjective symptoms; (3) the ALJ's RFC assessment was not supported by substantial evidence; and (4) the ALJ failed to make required findings of fact in concluding that Plaintiff could perform his past work. (Dkt. 15 at 6–20).

### A. The ALJ Did Not Properly Evaluate the Medical Opinion Evidence

Plaintiff first contends that the ALJ improperly assessed the opinions of Plaintiff's treating physicians, Drs. Appiagyei and Smith. By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D.

Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted).

Furthermore, even where a treater's opinion is not given controlling weight, an ALJ must still determine what value the assessment does merit by considering a variety of factors set forth in 20 C.F.R. § 404.1527. S*cott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Campbell*, 627 F.3d at 308. In other words, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ's opinion must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court[ ] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young*, 362 F.3d at 1002 (citations omitted). To build a logical bridge, the ALJ must "sufficiently articulate his assessment of the evidence to assure [the court] that he considered the important evidence and to enable [the court] to trace the path of his reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citation omitted).

### 1. Dr. Appiagyei

Dr. Appiagyei opined Plaintiff could lift and/or carry 10 pounds or less occasionally, and 20 pounds rarely. (R. at 366). Plaintiff could sit only one hour, stand only one hour, and walk only two blocks, at a time. (*Id*. 365). He could stand and/or walk for two hours, and sit for four hours, total, in an eight-hour workday. (*Id*. at 366). However, he required periods of walking around during the day and would need to shift positions, at will, between sitting, standing, or walking. (*Id*.). He would sometimes need to take unscheduled breaks, possibly every hour for 15–30 minutes because of muscle aches and pain. (*Id*.). Dr. Appiagyei opined Plaintiff's symptoms would constantly be severe enough to interfere with his attention and concentration, even to perform simple work tasks. (*Id*. at 365).

The ALJ offered only two reasons for affording partial weight to Dr. Appiagyei's opinions: (1) the objective evidence showed only slightly reduced strength and range of motion, which did not support such severe limitations, and (2) Plaintiff's treatment had been "generally conservative" since his February 2013 surgery. (R. at 26). The Court concludes that the ALJ's decision to give Dr. Appiagyei's only partial weight is legally insufficient and not supported by substantial evidence.

The ALJ acknowledged that "the evidence, including the [Plaintiff's] surgical history, support finding that the [Plaintiff's] left upper extremity and neck limit the claimant's functioning," but nevertheless concluded that the objective examination findings do not support Dr. Appiagyei's "severe limitations." (R. at 26). The only "objective findings" the ALJ relied upon in arriving at this conclusion were "slightly

reduced strength and range of motion." (*Id.*). The ALJ offered no explanation as to why such findings were inconsistent with Dr. Appiagyei's assessed limitations. Even more troubling, however, is the ALJ's failure to mention or consider the other abnormal clinical findings documented throughout Dr. Appiagyei's treatment records, such as tenderness to palpation in Plaintiff's cervical and lumbar paraspinal muscles (*id.* at 370, 373, 393, 414), and wasting and/or atrophy in Plaintiff's left arm and hand (*id.* at 373, 385, 388, 402). The ALJ further failed to address Plaintiff's continued reports of numbness, tingling, burning sensation, and pain radiation. (*Id.* at 369, 372, 384, 387, 402, 410, 433). While an ALJ need not mention every piece of evidence in his opinion, he is nevertheless obligated to consider all relevant medical evidence and may not cherry-pick facts by ignoring evidence that points to a disability finding. *See Craft*, 539 F.3d at 673; *Goble v. Astrue*, 385 F. App'x 588, 593 (7th Cir. 2010).

Additionally, the ALJ characterized Plaintiff's treatment as "generally conservative," placing particular emphasis on the fact that Plaintiff had not received any steroid injections. (R. at 26). However, "by not citing, or even alluding to, any expert medical evidence or opinion that non-routine or more aggressive treatments . . . would have been prescribed, recommended, or expected if [Plaintiff's] impairments and/or symptoms were as severe as he alleged, the ALJ was expressing a medical opinion for which he was not qualified." *McGuigan v. Colvin*, No. 13 CV 1539, 2015 WL 846415, at *5 (S.D. Ind. Feb. 25, 2015). Furthermore, in assessing Dr. Appiagyei's opinion, the ALJ made no mention of the

fact that Dr. Appiagyei regularly prescribed Plaintiff narcotic pain medications. The use of strong pain medication can also run counter to an ALJ's conclusion that a claimant only received conservative care. *See Solleveld v. Colvin*, No. 12 C 10193, 2014 WL 4100138, at *6 (N.D. Ill. Aug. 20, 2014) ("Although in some cases conservative treatment may contradict the severity of the limitations alleged, here the record shows that Solleveld was prescribed narcotics, including Vicodin and Norco, numerous times over her treatment history."); *see also Cunningham v. Colvin*, No. 14 C 420, 2014 WL 6634565, at *7 (E.D. Wis. Nov. 24, 2014) (citing cases).

Even assuming, *arguendo*, that the ALJ provided "good reasons" for not affording Dr. Appiagyei's opinion controlling weight, he was still required to address the factors listed in 20 C.F.R. § 404.1527 to determine what weight to give the opinion. Social Security Ruling (SSR)[4] 96-2p. SSR 96-2p states that treating source medical opinions "are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." *Id.*; 20 C.F.R. § 404.1527(c); *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

---

[4] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 201 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the court is "not invariably bound by an agency's policy statements, the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 556 F.3d 736, 744 (7th Cir. 2009).

Here, the ALJ afforded Dr. Appiagyei's opinion only partial weight, but failed to address many of the enumerated factors provided in 20 C.F.R. § 404.1527. Specifically, the ALJ did not discuss the nature and extent of the treatment relationship, the frequency of examinations, the supportability of the decision, the consistency of the opinion with the record as a whole, or whether Dr. Appiagyei had a relevant specialty. Multiple factors favor crediting Dr. Appiagyei's opinions, and "proper consideration of these factors may have caused the ALJ to accord greater weight to [Dr. Appiagyei's] opinions." *Campbell*, 627 F.3d at 308. Accordingly, remand is necessary for the ALJ to properly analyze and explain the weight to be afforded to the opinions of Dr. Appiagyei.

On remand, the ALJ shall reevaluate the weight to be afforded to the opinions of Plaintiff's treating physician. If the ALJ finds "good reasons" for not giving the opinion controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give the opinion.

### 2. Dr. Smith

Dr. Smith opined that Plaintiff was unable to perform at even 60% of his full work capacity due to ongoing loss of sensation resulting from scar formation, frequent and severe myalgia due to the lack of adequate muscle retraining, and

chronic pain reducing his sleep cycle. (R. at 567–68). Dr. Smith concluded that Plaintiff was not able to sustain an eight-hour workday. (*Id*.).

The ALJ gave Dr. Smith's opinion "only little weight," as Dr. Smith did not give any specific function-by-function limitations. (R. at 26). The ALJ also determined that Dr. Smith's opinion was contradicted by his own examination findings, in that although Dr. Smith noted limited neck range of motion, he also noted Plaintiff had intact muscle strength, reflexes, and sensation in both arms. (*Id*.). The Court concludes that the ALJ's assessment of Dr. Smith's opinion is legally insufficient and not supported by substantial evidence.

As an initial matter, the Court notes that the ALJ erred in considering Dr. Smith's opinion as that of a treating and examining medical source. Other than the December 2015 evaluation, the medical records contain no evidence that Plaintiff ever received treatment from Dr. Smith, much less had an ongoing treatment relationship with him. Without evidence of an ongoing treatment relationship, the Court cannot consider Dr. Smith a treating source.[5] A nontreating source is "a

_____

[5] The Commissioner has defined the term "treating source" as follows: Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source. 20 C.F.R. § 404.1527.

physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Dr. Smith falls squarely within this definition. As such, the ALJ was not required to apply the stringent treating source rule in evaluating Dr. Smith's opinion. Nevertheless, the ALJ is always required to explain how the evidence leads him to conclusions and how he resolved evidentiary conflicts. *Patterson v. Barnhart*, 429 F. Supp. 2d 869, 883 (E.D. Wis. 2006). More specifically, the ALJ must determine the weight a nontreating physician's opinion deserves by examining how well the physician supported and explained his opinion, whether the opinion is consistent with the record, whether the physician has a relevant specialty, and any other factor of which the ALJ is aware. *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(3)-(6)). The ALJ did not do so here, preventing the Court from assessing the reasonableness of the ALJ's decision in light of the factors indicated in 20 C.F.R. § 1527.

Furthermore, the ALJ's dismissal of Dr. Smith's opinion because he did not provide specific function-by-function limitations was error. The question of what a claimant can do despite his limitations is exclusively within the ALJ's purview. *See* 20 C.F.R. § 416.927(d)(2) (noting that the final responsibility of crafting the RFC is reserved to the Commissioner); *Bates v. Colvin,* 736 F.3d 1093, 1102 n. 4 (7th Cir. 2013) (noting that an opinion regarding what a claimant can or cannot do in a given day is not a "medical opinion" to which the ALJ must defer). Thus, an examining physician need not provide a function-by-function analysis. *See Colson v. Colvin,*

120 F. Supp. 3d 778, 792 (N.D. Ill. 2015). Dr. Smith's failure to provide such an analysis therefore does not support the ALJ's decision to disregard his opinions. *Id*.

In addition, the ALJ offered no explanation as to how the clinical findings of decreased cervical range of motion but intact muscle strength, reflexes, and normal sensation undermined or were inconsistent with Dr. Smith's conclusions. Once again, the ALJ failed to build the requisite "logical bridge" between the facts of the case and the outcome. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). This prevents the Court from assessing the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence.

## B. The ALJ's Evaluation of Plaintiff's Subjective Symptom Statements

Plaintiff next asserts that the ALJ erred in assessing his subjective symptom statements and credibility. (Dkt. 15 at 16–20). The Social Security Administration determined recently that it would no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the claimant's] symptoms." SSR 16-3p, at *2. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." SSR 16-3p, at *2.

In evaluating the claimant's subjective symptoms, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 16-3p, like

former SSR 96-7p, requires the ALJ to consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, at *4.

The Court will uphold an ALJ's subjective symptom evaluation if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss*, 555 F.3d at 561. The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Id.*

The Court finds that the reasons provided by the ALJ for rejecting Plaintiff's subjective symptom statements are legally insufficient and not supported by substantial evidence, warranting remand on this issue. *See Ghiselli v. Colvin*, 837 F.3d 771, 778–79 (7th Cir. 2016).

### 1. *"Routine and Conservative Treatment"*

The ALJ first concluded that Plaintiff "has generally not received the type of treatment one would expect for a person suffering from the degree of pain and limitation contended" by Plaintiff. (R. at 27). The ALJ determined that Plaintiff's physical therapy, at-home exercises, and pain medications constituted "routine and conservative treatment." (*Id.*). He specifically cited the absence of steroid injections

from Plaintiff's course of treatment, evidence that Plaintiff benefitted from the use of narcotic medications and physical therapy, and Dr. Appiagyei's recommendation that Plaintiff engage in activities such as walking, swimming, and riding a stationary bicycle. (*Id.*)

While the ALJ "may consider conservative treatment in assessing the severity of a condition," he should cite medical evidence about what kind of treatment would be appropriate. *Brown v. Barnhart*, 298 F. Supp. 2d 773, 797 (E.D. Wis. 2004) (citing *Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1096 (E.D. Wis. 2001)). Instead of citing evidence, the ALJ impermissibly relied on his own lay opinion that steroid injections (or some other form of more frequent or aggressive treatment) would have been pursued if Plaintiff's symptoms were as severe as alleged.[6] See *McGuigan v. Colvin*, No. 13 CV 1539, 2015 WL 846415, at *5 (S.D. Ind. Feb. 25, 2015) ("by not citing, or even alluding to, any expert medical evidence or opinion that non-routine or more aggressive treatments . . . would have been prescribed, recommended, or expected if [Plaintiff's] impairments and/or symptoms were as severe as he alleged, the ALJ was expressing a medical opinion for which he was not qualified."). On remand, the ALJ should ask why Plaintiff's treatment was not more aggressive, and if the ALJ determines that the treatment was conservative, he shall discuss why more aggressive treatment would have been appropriate. *See Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009).

---

[6] This strikes the Court as particularly inappropriate in a case where the Plaintiff had surgery, the least conservative treatment available.

Further, the ALJ failed to explain how the fact that Plaintiff "received benefit from narcotic medication" makes Plaintiff's statements regarding the limiting effects of his pain less credible. (R. at 27). Plaintiff did not dispute that his medications provide some amount of pain relief. However, benefitting from medication, especially in this case, is not the same as experiencing complete relief. Even with the use of Norco and Neurontin, Plaintiff testified that his pain is five or six out of ten, and often reported current pain levels of seven or eight out of ten to his doctors. (*See, e.g.*, R. at 53, 369, 374, 376, 378, 381, 392, 397, 408, 410, 413, 416, 419, 421, 429, 429, 433, 438, 496).

The use of prescription pain medication is objective evidence that can support an individual's assertions of pain. *See Stark v. Colvin*, 813 F.3d 684, 687-88 (7th Cir. 2016); *see also Spaulding v. Astrue*, 702 F. Supp. 2d 983, 999 (N.D. Ill. 2010) (stating that an ALJ errs when he fails to consider all of a claimant's relevant medications). The use of strong pain medication can also run counter to an ALJ's conclusion that a claimant only received conservative care. *See Solleveld v. Colvin*, No. 12 C 10193, 2014 WL 4100138 (N.D. Ill. Aug. 20, 2014) ("Although in some cases conservative treatment may contradict the severity of the limitations alleged, here the record shows that Solleveld was prescribed narcotics, including Vicodin and Norco, numerous times over her treatment history."); *see also Cunningham v. Colvin*, No. 14 C 420, 2014 WL 6634565, at *7 (E.D. Wis. Nov. 24, 2014) (citing cases). "It is not clear why an individual who has a pain level of 6/10 can have [his] credibility dismissed in the conclusory manner that the ALJ said it could." *Ahmad*

*v. Colvin*, No. 14 C 2959, 2016 WL 98567, at *7 (N.D. Ill. Jan. 8, 2016). Plaintiff does not allege he is paralyzed by pain; he essentially claims that his pain prevents his from working on a full-time basis. The ALJ failed to draw any bridge from Plaintiff's reported pain levels to his conclusion that he could work eight hours a day, five days a week. *See Cunningham*, 2014 WL 6634565, at *7.

Similarly, the ALJ pointed out that "physical therapy resulted in some benefits." (R. at 27). But "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce." *Scott v. Astrue*, 647 F.3d 734, 739–40 (7th Cir. 2011). While Plaintiff met several of his goals with physical therapy, upon discharge he continued to demonstrate decreased left hand grip and pinch strength, impaired sensation in his left hand, and still reported numbness in his left hand and a burning sensation from his elbow to his wrist. (*Id.* at 480). He also continued to report high pain levels to his doctors and consistently exhibited decreased or limited range of motion in his neck and back. He continued to require narcotic pain medications. "An ALJ has the obligation to consider all relevant evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Finally, the fact that Dr. Appiagyei *recommended* Plaintiff engage in activities such as walking, swimming, or riding a stationary bicycle *as tolerated* does not undermine Plaintiff's reported symptoms and limitations, and it was improper for the ALJ to rely on exercise, as a form of therapy, to discredit Plaintiff's statements.

*See Scrogham v. Colvin*, 765 F.3d 685, 701–02 (7th Cir. 2014) (it was unreasonable for the ALJ to rely upon a claimant's walking because it was a form of therapy and did not rise to the level of full-time work activity); *Carradine v. Barnhart*, 360 F.3d 751, 755–56 (7th Cir. 2004) ("Since exercise is one of the treatments that doctors have prescribed for Carradine's pain, and she does not claim to be paralyzed, we cannot see how her being able to walk two miles is inconsistent with her suffering severe pain."). In addition, the ALJ should have considered the nature of Plaintiff's at-home exercises. Plaintiff testified that his home exercise plan essentially involves some stretching with a band, little leg lifts, and small calisthenics. (R. at 54). He also indicated that he tried walking, but only for about 15 minutes at a time. (*Id.*). The ALJ offered no explanation as to how these activities are inconsistent with Plaintiff's reported symptoms and limitations.

### 2. *Plaintiff's Activities of Daily Living*

Next, the ALJ failed to explain how Plaintiff's ability to complete limited daily activities undermines his allegations of pain or equates to an ability to perform full-time work. (R. at 27). While an ALJ is permitted to consider a claimant's activities when assessing a claimant's subjective symptom statements, the Seventh Circuit has repeatedly instructed that ALJs are not to place "undue weight" on those activities. *Moss*, 555 F.3d at 562; *see Punzio*, 630 F.3d at 712 ("[The claimant's] ability to struggle through the activities of daily living does not mean that [the claimant] can manage the requirements of a modern work-place"); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work,

flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). Further, when an ALJ does analyze a claimant's daily activities, the analysis "must be done with care." *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).

Here, the ALJ concluded that Plaintiff's activities of daily living (specifically, helping his six-year-old son get ready for school, driving, using public transportation, and living in a two-story house) do not support the alleged severity of Plaintiff's symptoms and limitations. (R. at 27). But the ALJ failed to articulate *how* such activities contradicted his complaints of severe pain and reported limitations. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[An ALJ] must explain perceived inconsistencies between a claimant's activities and the medical evidence."); *Ghiselli*, 837 F.3d at 778 (finding error when ALJ did not "identify a basis for his conclusion that the life activities [claimant] reported were inconsistent with the physical impairments she claimed"). Likewise, these limited activities do not demonstrate that Plaintiff can perform full-time work. *See Bjornson*, 671 F.3d at 647 ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer.") (collecting cases); *Carradine*, 360 F.3d at 755 (ALJ failed to consider the difference between a person being able to

engage in sporadic physical activities and [his] being able to work eight hours a day five consecutive days of the week).

### 3. Plaintiff's Demeanor at the Hearing

Finally, the ALJ found Plaintiff's appearance and demeanor at the hearing to be unpersuasive. (R. at 27). The ALJ noted that even though Plaintiff had not taken his pain medication that day, he "did not appear to be in any observable or significant discomfort," and "although [Plaintiff] stood briefly during the hearing, there were no overt pain signs or complaints." (*Id*.). An ALJ is allowed to consider physical appearance and demeanor at the administrative hearing as one factor in assessing credibility, but the ALJ must explain how a claimant's testimony or demeanor during the hearing contradicts his claim. *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). The ALJ did not do so here. Moreover, the fact that Plaintiff had to stand during the hearing contradicts the ALJ's conclusion that Plaintiff demonstrated no discomfort or pain behavior.

It is true that "[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722–23 (7th Cir. 2009) (emphasis in original). However, here, the ALJ did not provide "enough" valid reasons for discounting Plaintiff's symptom statements. *See Ghiselli*, 837 F.3d at 778 ("The ALJ's unsupported judgments . . . are not the sort of credibility determinations entitled to deference."); *see also Thomas v. Colvin*, 745 F.3d 802, 806–07 (7th Cir. 2014) ("Because all of the other reasons given by the ALJ were illogical or otherwise flawed, this reason cannot alone support the finding that [claimant] was

incredible."); *Allford v. Barnhart,* 455 F.3d 818, 821 (7th Cir. 2006) ("The administrative law judge based his judgment call on a variety of considerations but three of them were mistaken. Whether he would have made the same determination had he not erred in these respects is speculative.").

Based on the above shortcomings, and viewing the record as a whole, the Court concludes that the ALJs analysis of Plaintiff's subjective symptom statements requires remand. The Court is not concluding that the ALJ's evaluation of Plaintiff's subjective symptom statements is incorrect, but that greater elaboration is necessary. On remand, the ALJ shall reevaluate Plaintiff's allegations with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## C. Other Issues

Because the Court is remanding to reevaluate the weight to be given to the medical opinion evidence and to reassess Plaintiff's subjective symptom statements, the Court chooses not to address Plaintiff's other arguments. On remand, after determining the weight to be given the treating physician's opinion, the ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th

Cir. 2014) (citation omitted). Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## D.    Remedy

Plaintiff requests a reversal of the Commissioner's decision with an order to award benefits or, in the alternative, a reversal with a remand for further proceedings. When reviewing a denial of disability benefits, a court may "affirm, reverse, or modify the Social Security Administration's decision, with or without remanding the case for further proceedings." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing 42 U.S.C. § 405(g)). The court may reverse with an instruction to award benefits only if "all factual issues have been resolved and the record can yield but one supportable conclusion." *Briscoe ex. re. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005) (citation omitted). That is not the case here. The ALJ failed to properly evaluate the medical opinion evidence and failed to properly evaluate Plaintiff's subjective symptom statements. It is not the purview of this Court to gather or reweigh evidence. Therefore, remand for further proceedings is the appropriate remedy.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's request for summary judgment is **GRANTED** and Defendant's motion for summary judgment [19] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and

the case is remanded to the Commissioner for further proceedings consistent with this Opinion.

Dated: September 19, 2017

E N T E R:

_____
MARY M. ROWLAND
United States Magistrate Judge